IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LISA PETRAUSKAS,                                        CV 08-771-MA

       Plaintiff,                                    OPINION AND ORDER

v.

MICHAEL ASTRUE,
Commissioner of Social
Security,

       Defendant.

MEAGHAN A. FLYNN
Preston, Bunnell & Flynn, LLP
1500 S.W. First Ave., Suite 770
Portland, OR 97201
(503) 227-5445

       Attorneys for Plaintiff

KENT S. ROBINSON
Acting United States Attorney
BRITANNIA I. HOBBS
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1158

1 - OPINION AND ORDER

LEISA WOLF
Special Assistant United States Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900 MS/901
Seattle, WA  98104-7075
(206) 615-3621

      Attorneys for Defendant

MARSH, Judge.

     Plaintiff Lisa Petrauskas seeks judicial review of the Commissioner's final decision denying her April 11, 2003, application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33.

     Plaintiff alleges she has been disabled since January 12, 2001, because of memory problems, vertigo, extreme anxiety, attention disorder, headaches, pain, lack of focus, fatigue, irritability, and depression.  Her claim was denied initially and on reconsideration.

     On September 23, 2004, the Administrative Law Judge (ALJ) conducted an evidentiary hearing on plaintiff's April 2003 application, and on December 20, 2004, issued a decision that plaintiff was not disabled.  On November 3, 2005, the Appeals Council denied plaintiff's request for further review.  The ALJ's decision, therefore, was the Commissioner's final decision for purposes of judicial review.

In January 2006, plaintiff filed an action in this court, Petrauskas v. Commissioner, 06-CV-0027-KI, seeking judicial review of the Commissioner's final decision.  In September 2006, pursuant to the parties' stipulation, the court remanded the matter for the Commissioner to (1) consider whether plaintiff's impairments, either singly or in combination, meet or equal a Listed Impairment, (2) consider the medical opinion of Stephen Solzberg, M.D., (3) consider the medical opinion of J. Bruce Bell, M.D., (4) reconsider plaintiff's subjective complaints, including those relating to headaches, (5) consider the lay evidence of plaintiff's husband, (6) consider vocational evidence from Heidi Dirske and Holly Beckman, (7) obtain further medical expert opinion, (8) allow plaintiff to submit new evidence, and (9) if necessary, obtain additional vocational expert testimony.

On October 31, 2007, and December 6, 2007, the ALJ held evidentiary hearings on remand, and on April 24, 2008, the ALJ issued a second decision that plaintiff was not disabled.  The Appeals Council declined to assume jurisdiction.  The ALJ's April 24, 2008 decision, therefore, was the Commissioner's final decision for purposes of judicial review.  20 C.F.R § 404.984(a).

Plaintiff now seeks an Order from this court reversing the Commissioner's final decision and remanding the case for the payment of benefits.  For the following reasons, I **AFFIRM** the final decision of the Commissioner and **DISMISS** this action.

3  - OPINION AND ORDER

### THE ALJ'S FINDINGS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled. <u>Bowen v. Yuckert</u>, 482 U.S.137, 140 (1987). <u>See also</u> 20 C.F.R. § 416.920. Plaintiff bears the burden of proof at Steps One through Four. <u>See</u> <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999). Each step is potentially dispositive.

On remand, at Step One, the ALJ found plaintiff did not engage in substantial gainful activity from the alleged onset date of her disability on January 12, 2001, to the date she was last insured on September 30, 2005.

At Step Two, the ALJ found that plaintiff has severe impairments, including a history of traumatic brain injury, chronic myofascial pain versus fibromyalgia, depression, and an anxiety disorder.

At Step Three, the ALJ found these impairments do not meet or equal the requirements of any Listed Impairment.

The ALJ found plaintiff has the residual functional capacity in an eight-hour workday to perform unskilled work that involves sitting for eight hours with normal breaks every two hours, standing for 30 minutes at a time for six hours, walking up to one mile, and lifting 10 lbs. She should avoid putting pressure on her neck. She can perform postural activities occasionally, <u>i.e.</u>, one-third of the workday. She has no limitations in using

her hands, seeing, and communicating.  She must avoid unprotected heights and hazardous machinery.

At Step Four, the ALJ found that plaintiff was unable to perform her past relevant work as a baker, middle school teacher, photographer, line cook, bike shop driver, barista, office manager, and waitress.

At Step Five, the ALJ found that plaintiff was able to perform a significant number of other jobs that exist in the national economy, including surveillance system monitor, and addresser.

Consistent with the above findings, the ALJ found plaintiff is not disabled and denied her claim for disability insurance benefits.

## LEGAL STANDARDS

The initial burden of proof rests on the claimant to establish disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  To meet this burden, the claimant must demonstrate the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C § 423(d)(1)(A).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are

supported by substantial evidence in the record as a whole.
42 U.S.C. § 405(g).  "Substantial evidence means more than a mere
scintilla but less than a preponderance; it is such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir.
1995).

The court must weigh all of the evidence whether it supports
or detracts from the Commissioner's decision.  Martinez v.
Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's
decision must be upheld, however, even if the "evidence is
susceptible to more than one rational interpretation."  Andrews,
53 F.3d at 1039-40.

The Commissioner bears the burden of developing the record.
DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).  The duty
is triggered when there is ambiguous evidence or when the record
is inadequate to allow for proper evaluation of the evidence.
Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001).

The decision whether to remand for further proceedings or
for immediate payment of benefits is within the discretion of the
court.  Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.), cert.
denied, 121 S. Ct. 628 (2000).  "If additional proceedings can
remedy defects in the original administrative proceeding, a
social security case should be remanded."  Lewin v. Schweiker,
654 F.2d 631, 635 (9th Cir. 1981).

6  - OPINION AND ORDER

## ISSUES ON REVIEW

The issues are whether the ALJ erred (1) in not giving clear and convincing reasons for rejecting plaintiff's testimony regarding the severity of her symptoms, (2) in not giving germane reasons for rejecting the lay witness evidence of plaintiff's husband, (3) in not giving clear and convincing reasons for rejecting the medical opinions of plaintiff's treating physicians, (4) in not considering plaintiff's difficulties in paying attention and concentrating, and (5) in improperly evaluating the evidence as to whether plaintiff has a Listed Impairment or can perform other work in the national economy.

## PLAINTIFF'S EVIDENCE

Plaintiff's evidence is drawn from her application for disability benefits, her hearing testimony on September 23, 2005, October 31, 2007, and December 6, 2007, and her work history reports.

a.   **Background.**

Plaintiff was 37 years old on the date of the last hearing. She is married with no children. She obtained a Master of Fine Arts degree in fiction writing in 2000. She stopped writing in 2006, because, as with other areas of her life, she did not expect to achieve what "normal people are achieving" in their daily activities, including work. Plaintiff's hobbies have

included cycling, hiking, drawing, painting, and photography.

Plaintiff drives two to three times a week to doctors' appointments and to shop for groceries.

**b.    Work History.**

Plaintiff last worked in January 2001 in a bakery shop, where she was required to lift up to 50 lbs. She quit because she was physically exhausted, felt suicidal, and was in pain. Before that, she tutored English as a student in Montana and ran an after-school program teaching poetry. She has also worked as a newspaper photojournalist, coffee barista, officer manager in a small advertising agency, warehouse delivery driver for a bicycle store, cook at a guest ranch, busboy, and raspberry picker.

**c.    Medical Issues.**

Plaintiff testified that she has suffered from physical pain since she hit her head after falling from a horse in 1997. She has frequent pain in her left hip, left back, left ribs, neck, and shoulders. She also suffers from headaches, vertigo with dizziness and nausea, and has difficulty balancing.

She has received treatment from a psychiatrist who helped her with medications, and a massage therapist who helped her cope with joint pain.

**d.    Daily Activities.**

Plaintiff is able to sit and stand for ten minutes and walk

a mile around the neighborhood.  She is also able to lift some things, but is unable to estimate their weight.  She tries to keep up with household chores and take care of two cats and a dog whom she walks when she is able physically to do so.

Plaintiff's ability to function varies from day-to-day. Some days, several times a month, she does not get out of bed, and other days she does not eat because she unable to deal with food preparation.  She isolates from people because talking to them is stressful.  Everything is too overwhelming.

## LAY WITNESS EVIDENCE

Plaintiff's husband, Christopher Petraukus, testified that plaintiff is afraid to drive because she panics and becomes emotionally imbalanced, sometimes suffering physical pain as a result.  She has working skills but becomes severely anxious and feels overwhelmed with panic attacks and suicidal thoughts when she goes to work or performs other tasks.  She is unable to maintain any emotional consistency that would allow her to work. She is frequently unable to finish whatever she starts, whether it is a household chore, an art project, or simply turning off the lights.

## RELEVANT MEDICAL EVIDENCE

a.  **Medical/Mental Health Treatment**.

J. Bruce Bell, M.D. - Neurologist.

In August 1999, Dr. Bell first treated plaintiff for pain

and a personality change caused by plaintiff's fall from a horse two years earlier. She told him she was knocked unconscious for a brief period. She remembered that when she woke up, she had pain on her left side, in the hip, chest, and neck areas, but x-rays did not show any fractures. Plaintiff told Dr. Bell that since then, she has noticed personality changes, including episodes of unreasonable fear and terror. These panic and anxiety episodes worsened while she was on a visit to India. She has frequent frontal headaches associated with photophobia that are sometimes relieved by Advil. She has spells of rapid heart beat during which she feels off-balance and dizzy. Her sleep pattern has been disturbed since she fell from the horse.

Dr. Bell's neurological examination of plaintiff was normal, with no evidence of wasting, weakness, atrophy, or involuntary muscle contractions. Her gait and tandem walking were also normal. An MRI of the brain was normal and an EEG showed minor abnormalities. Based on these results, Dr. Bell diagnosed cervical, thoracic, and lumbar strain, with residual myofascial pain, and persistent post-concussion symtomatology.

In September 2001, plaintiff complained of persistent neck and mid-back pain that was relieved by osteopathic adjustments. She also had persistent headaches, and neck and mid-back spasms. Dr. Bell diagnosed cervical strain syndrome, post-concussion

10 - OPINION AND ORDER

syndrome  with depressive reaction, headache, and dizziness.

In October 2001, plaintiff was doing better but was still occasionally despondent.  She described being "a little spacy" at times, with a poor memory, and difficulty thinking.

In January 2002, plaintiff was improving.  Her memory was getting better and she had no anxiety.

In July 2002, plaintiff was still having significant difficulties with headaches, memory, dizziness, fatigue, and depression.  She was discouraged and was unable to consistently hold down a job.  She felt she was impaired by memory problems, intermittent pain, and dizziness.

In January 2003, plaintiff continued to have problems with her memory, severe headaches, fatigue, and depression.  Dr. Bell noted the "headaches will knock her down for a week at a time."  She was "very discouraged because she feels she is quite disabled."

In June 2004, plaintiff had some improvement in her emotional stability and energy level, and was more physically active.  She still experienced persistent depression, anxiety, spaciness, vertigo, dizziness, nausea, and headaches.  Dr. Bell was confident plaintiff "would get over this" in time.  Dr. Bell also found plaintiff had muscle spasms in the neck and mid-back but she had no abnormal neurological findings.

In September 2004, Dr. Bell completed a Federal Loan Discharge Application at plaintiff's request in which he stated that plaintiff was unable to work because of post-concussive syndrome and cognitive dysfunction.

In January 2006, plaintiff's neurological examination was normal.  Plaintiff, however, continued to be depressed, and still had pain on the left side of her neck radiating into the shoulder as well as in the left arm, hip, buttock, and knee.

In April 2006, another MRI showed no evidence of focal disc changes or central canal or neural foraminal stenosis.  Dr. Bell noted mild degenerative changes in the facet joints at L5-S1.

In November 2006, Dr. Bell further opined that plaintiff had ongoing muscle spasm up and down her entire spine, with radiculopathy characterized by decreased left ankle jerk, supported by left back pain, flank and left lateral leg pain. She also had significant cognitive difficulties in concentrating and functioning.

In October 2007, Dr. Bell opined plaintiff suffered from myofascial pain and fibromyalgia, degenerative changes of the L5-S1 facets, and debilitating headaches.  He opined she was limited to sitting in one position for no longer that 15-30 minutes at a time during an eight-hour work day and she probably should not lift more than 10 lbs on an occasional basis.

<u>Paul Miller, D.O. - Osteopathic Physician</u>.

Dr. Miller treated plaintiff on a monthly basis from February 2001-October 2002, for myofibrositis, lumbar strain, somatic dysfunction, post-concussion syndrome, depression, and anxiety.  His extensive handwritten chart notes reflect her complaints and his course of treatment, which included a recommendation that she exercise by walking and swimming.  In October 2002, he opined that plaintiff was not disabled.

<u>Kaiser Permanente</u>:  <u>Thomas Smurthwaite, Ph.D - Psychologist</u>.
<u>Stephen Stolzberg, M.D. - Psychiatrist</u>.
<u>Carla Bowman , M.D. - Family Practice</u>.
<u>Joji Kappes, M.D. - Rheumatologist</u>.

Dr. Smurthwaite, regularly, and Dr. Stolzberg, occasionally, provided mental health treatment to plaintiff through Kaiser Permanente from October 2002 to June 2003, and intermittently thereafter until February 2006.

In October 2002, Dr. Smurthwaite preliminarily diagnosed plaintiff with post-concussive syndrome, left-side chronic pain, and ongoing adjustment to limitations resulting from plaintiff's fall from her horse in 1997.  Dr. Smurthwaite also noted possible diagnoses of post-traumatic stress disorder and "disorder due to head trauma."  He assigned plaintiff a GAF score of 70 (some difficulty in social, occupational, or school functioning).  His treatment goal was to reduce plaintiff's fear.  In general, over

the next seven months, Dr. Smurthwaite noted mild to moderate improvement in plaintiff's symptoms. He noted no significant cognitive impairment. In May 2003, his focus was on improving plaintiff's relationship with her mother and dietary issues.

In June 2003, Dr. Stolzberg diagnosed a cognitive impairment caused by traumatic brain injury, with difficulties driving and working. He assigned plaintiff a GAF score of 41 (serious impairment in social, occupational, or school functioning). Plaintiff experienced significant improvement in her mood after taking Celexa, an antidepressant medication.

At the same time, Dr. Smurthwaite noted plaintiff had difficulty paying attention to one task and was having mild cognitive-linguistic deficits that were not within normal limits for her age, gender, and background. He recommended a short course of speech therapy. Later that month, plaintiff reported progress from her cognitive rehabilitation work and her symptoms were improved.

In July 2003, Dr. Stolzberg noted plaintiff had symptoms of post-traumatic stress disorder relating to startle response and persistent nightmares, but her mood and functioning were "o.k." and she was hopeful about the future. On the same day, two hours later, plaintiff told Dr. Smurthwaite that she had a "tough day." Dr. Smurthwaite noted she had the most intense anxiety she had

demonstrated in his office to that date, and that she seemed to be struggling, feeling overwhelmed and very anxious.

In September 2003, plaintiff reported to Dr. Smurthwaite that she was having ongoing difficulties in her relationship with her mother. A month later, however, Dr. Smurthwaite noted plaintiff seemed more empowered in that relationship.

In August 2004, Dr. Stolzberg noted plaintiff was mildly depressed. She experienced a "rare" panic attack after a close call while she was driving in traffic that reminded her of her fall from the horse. She did not feel suicidal except when she was in a lot of pain, which was about once a week. Dr. Stolzberg noted the Celexa antidepressant medication was helpful in preventing panic attacks and improving her mood.

In January 2005, plaintiff told Dr. Stolzberg that she had been depressed for two weeks with little inclination to get out of bed. Her depression, however, alternated with periods where her mood, energy, and libido were good. She was debating whether to take steps to have a baby but was concerned because of her mood swings.

In March 2005, plaintiff reported to Dr. Stolzberg that occasionally she does not stop with physical activity such as gardening. She described "trashing [her] body in the garden." She was having aches, pains and headaches.

In January 2006, Dr. Bowman saw plaintiff for complaints of muscle aches.  Plaintiff told her they had been occurring on an ongoing basis for a decade.  She also mentioned she had seen a chiropractor on a regular basis who was helpful and who diagnosed her as suffering from fibromyalgia.  She sought confirmation of that diagnosis.  Dr. Bowman diagnosed Myalgia.  In February 2006, Dr. Kappes examined plaintiff on referral from Dr. Bowman.  He found her to be a well-nourished woman in no distress with normal mood and affect.  She was able to move her neck fully, and her shoulders, elbows, wrists, and fingers showed no evidence of arthritis.  She was able to move her back well.  Her gait and stance were normal, and she had no difficulty moving her knees, ankles, and toes.  She had an absent left knee jerk.  Her sensory exam and muscle strength were normal.  Plaintiff, however, exhibited 18/18 fibromyalgia tender points.  Dr. Kappes diagnosed fibromyalgia syndrome, posttraumatic.

Dirkse Counseling and Consulting.

In March 2003, rehabilitation counselor Heidi Dirkse, M.S., CRC, and vocational consultant Holly Beckman, B.S., assessed plaintiff's work capability based on her self-evaluation and testing of her cognitive, sensory, motor, emotional/behavioral, and vocational functioning.  Based on her self-evaluation and test results, Dirske and Beckman opined plaintiff would have

significant problems working part-time.  Plaintiff's prognosis for successful gainful employment was poor based on her low test scores as to attention and concentration and her self-described physical impairments, _i.e._, a need to change positions regularly.

**b.    Medical/Mental Health Examinations.**

Duane D. Kolilis, Ph.D. - Psychologist.

In July 2007, Dr. Kolilis performed a psychodiagnostic examination on behalf of Disability Determination Services (DDS). During the examination, plaintiff's mood was normal.  Her gait was slower and guarded when she first stood up at the end of the interview but shortly returned to normal. Her responses varied from spontaneous and detailed to guarded, vague, and evasive. She was not a consistently reliable historian.  She tended to emphasize the effects of her horse-riding accident and minimize problems from other sources including her relationship with her parents.

Based on his examination, Dr. Kolilis opined plaintiff does not meet the diagnostic criteria for Post-Traumatic Stress Disorder resulting from the horse-riding accident because although she stated she had flashbacks to the accident, she could not remember any details.  She also appeared to embellish the accident by implying that the horse may have been struck by a car.  Dr. Kolilis found plaintiff's statement that she did

not know whether her horse was injured "curious and lacking credibility." Dr. Kolilis opined plaintiff was overly concerned with parental disapproval and fell back on her complaints of memory and cognition problems from the 1997 injury to "deflect their criticism." He opined that plaintiff's overall attention and concentration were good and she had average intellectual abilities. Finally, Dr. Kolilis opined there was insufficient evidence to support a current psychological impairment that would prevent employment. He assigned a current GAF score of 65 (some difficulty in social, occupational or school functioning).

    <u>John H. Ellison, M.D. - Internal Medicine</u>.

    In August 2007, Dr. Ellison performed a comprehensive orthopedic examination of plaintiff on behalf of DDS. He noted plaintiff's affect was anxious, but she was cooperative with questionable memory tracking and conversational understanding. Plaintiff exhibited a tender left sacroiliac joint but otherwise her back exhibited no scoliosis or muscle spasm, and she had good range of motion. Her extremities were normal with very little tenderness. Her range of motion in all areas was normal. The neurologic examination was normal in all respects.

    Dr. Ellison diagnosed post-concussive syndrome, chronic anxiety and depression, with general body pain, worse in the left sacroiliac area. Plaintiff's physical abilities appeared to be

average, with no physical disability.

Dr. Ellison opined plaintiff is able to lift up to 10 lbs continuously, lift and carry up to 11-20 lbs frequently, and lift up to 50 lbs occasionally. She is able to stand and walk for one hour at a time and sit for four hours at a time without interruption. She is able to sit for a total of eight hours, stand for a total of three hours, and walk for a total of two hours in an eight-hour work-day.

**c.    Medical/Mental Health Consultations.**

Robert McDevitt, M.D. - Psychiatrist.

Dr. McDevitt reviewed plaintiff's medical records and heard the testimony at the October 31, 2007, and December 6, 2007 hearing. He opined that the GAF scores of 70 and 65 assigned to plaintiff by Dr. Smurthwaite and Dr. Kolilis, respectively, were more reliable than the GAF score of 41 assigned to plaintiff by Dr. Stolzberg because Dr. Stolzberg offered his opinion after he had examined plaintiff only once and had not reviewed plaintiff's medical records. On the other hand, Dr. Smurthwaite had seen plaintiff on 14 occasions and Dr. Kolilis had obtained a complete personal history and reviewed plaintiff's medical records before they assigned their respective GAF scores.

**ANALYSIS**

a.    **Rejection of Plaintiff's Testimony**.

Plaintiff contends the ALJ on remand failed to give clear and convincing reasons for not crediting her testimony regarding the severity of her impairments.

A claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged. . . .'" Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (quoting 42 U.S.C. § 423(d)(5)(A) (1988)). See also Cotton v. Bowen, 799 F.2d 1403, 1407-08 (9th Cir. 1986). The claimant need not produce objective medical evidence of the symptoms or their severity. Smolen v. Chater, 80 F.3d 1276, 1281-82 (9th Cir. 1996).

If the claimant produces objective evidence that underlying impairments could cause the pain complained of and there is no affirmative evidence to suggest the claimant is malingering, the ALJ is required to give clear and convincing reasons for rejecting plaintiff's testimony regarding the severity of his symptoms. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). See also Smolen, 80 F.3d at 1283. To determine whether the claimant's subjective testimony is credible, the ALJ may rely on (1) ordinary techniques of credibility evaluation such as the claimant's reputation for lying, prior inconsistent statements

20 - OPINION AND ORDER

concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) an unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. Id. at 1284 (citations omitted).

Here there is no evidence of malingering. Plaintiff contends the ALJ improperly failed to credit her testimony regarding the severity of her physical and mental impairments.

First, plaintiff argues the ALJ improperly relied solely on the lack of objective medical evidence in rejecting her subjective complaints. See Reddick v. Chater, 153 F.3d 715, 722 (9th Cir. 1998)("Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence."). I disagree.

The record reflects the ALJ also relied on plaintiff's description of her daily activities that was inconsistent with her claimed level of physical impairment. Plaintiff acknowledged that in 2001 she was walking two-to-four miles a day three days a week, and cycling 10 miles. In June 2004, she was working strenuously in her garden. The ALJ noted that Dr. Miller, one of her treating physicians, encouraged her to exercise by walking

21 - OPINION AND ORDER

and swimming, medical records reflected plaintiff had full range
of motion in her neck, back, knees, ankles, and toes, and normal
muscle strength and, although plaintiff complained of headaches,
she sought little medical treatment for them and her pain was
adequately controlled by over-the-counter medications.

On this record, I conclude the ALJ gave clear and convincing
reasons for not entirely crediting plaintiff's testimony as to
her functional limitations.

**b.**   **Rejection of Lay Witness Evidence**.

Plaintiff contends the ALJ failed to consider the lay
witness evidence submitted by her husband.

Lay witness evidence of a claimant's symptoms "is competent
evidence" an ALJ must consider unless she "expressly determines
to disregard such testimony and gives reasons germane to each
witness for doing so." <u>Lewis v. Apfel</u>, 236 F.3d 503, 511
(9th Cir. 2001). The ALJ's failure to discuss lay witness
testimony constitutes error unless "no reasonable ALJ, when
fully crediting the testimony, could have reached a different
disability determination." <u>Stout v. Commissioner</u>, 454 F.3d 1050,
1056 (9th Cir. 2006).

In 2003, plaintiff's husband reported that he had witnessed
plaintiff undertake jobs in good faith "only to find they were
overwhelming her with pain, panic, and exhaustion to the point

22 - OPINION AND ORDER

where she talked openly of suicide." He also reported that plaintiff suffered from unpredictable and frequently limiting physical pain. At the first hearing in September 2004, he also testified that plaintiff's panic attacks and anxiety prevented her from going to work on a consistent and regular basis.

The ALJ addressed the husband's lay evidence and noted he made statements regarding plaintiff's daily activities that did not fully support his opinion as to plaintiff's ability to work. For example, the husband reported that, in an average week, plaintiff visited friends and relatives twice, shopped three times, ran errands, ate out, had coffee with friends, watched movies, walked a mile two or more times a week, gardened and did yard work seasonally two or more hours daily, did arts and craft one or more hours twice weekly, wrote for one hour four times weekly, did laundry weekly, cared for her pets, and prepared daily meals. Plaintiff was able to relieve her pain by taking Ibuprofen medication.

On this record, I conclude the ALJ considered the husband's lay evidence appropriately and gave germane reasons for crediting some of it while rejecting the husband's opinion regarding his wife's ability to engage in substantial gainful activity.

c.    __Failure to Adequately Consider the Medical Evidence__.

The ALJ is responsible for resolving conflicts in the medical record.  Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003).  The opinions of physicians with the most significant clinical relationship with the claimant are generally entitled to more weight than the opinions of those physicians with lesser relationships.  Carmickle, 533 F.3d at 1164.  The opinions of treating physicians should be credited as true if the ALJ fails to provide clear and convincing reasons for rejecting them.  Smolen v. Chater, 80 F.3d 1273, 1992 (9th Cir. 1996).

Plaintiff contends the ALJ improperly rejected the opinions of Dr. Bell and Dr. Stolzberg.  I disagree.

Dr. Bell.

The ALJ gave little weight to Dr. Bell's opinion that plaintiff was unable to work and/or had workplace limitations because (1) Dr. Bell's objective neurological findings in 2003-2004 were normal and showed no significant wasting, weakness, atrophy, or muscle twitching that would support a disability finding, (2) his diagnosis of disabling fibromyalgia was made in 2007, outside the last date in 2005 that plaintiff was insured, (3) his disability opinion was inconsistent with the opinion of Dr. Miller, who treated plaintiff on a monthly basis in 2001 and 2002, that plaintiff was not disabled, and

(4) his diagnosis as to plaintiff's mental limitations was not supported by other evidence in the record, e.g., the opinions of Dr. Smurthwaite and Dr. Kolilis, who, unlike Dr. Bell, are psychologists.

On the record as a whole, I conclude the ALJ gave clear and convincing reasons for not crediting Dr. Bell's disability opinion.

Dr. Stolzberg.

The ALJ rejected Dr. Stolzberg's opinion in June 2003 that plaintiff had a serious impairment in social and occupational functioning based on a GAF score of 41 because (1) the score was based on one examination, (2) subsequent medical records showed improvement in plaintiff's mental state, and (3) the higher GAF scores assigned by Dr. Smurthwaite and Dr. Kolilis (71 and 65 respectively) were more reliable because, unlike Dr. Stolzberg, Dr. Smurthwaite had seen plaintiff on multiple occasions, and Dr. Kolilis had obtained a complete personal history and reviewed plaintiff's medical records before each of them assigned their GAF scores.

On this record, I conclude the ALJ gave clear and convincing reasons for crediting the GAF scores assigned by Dr. Smurthwaite and Dr. Kolilis over the GAF score assigned by Dr. Stolzberg.

**d.    Failure to Adequately Consider Plaintiff's
Attention and Concentration Deficits.**

Plaintiff contends the ALJ erred in failing to address
the opinions of Rehabilitation Counselor, Heidi Dirske and
Vocational Consultant Holly Beckman that plaintiff has an
impairment in maintaining concentration and attention that
severely limits her functioning in daily living and work.  As
noted, they opined that because of that impairment, plaintiff
would have difficulty working even on a part-time basis and as a
result, her prognosis for successful gainful employment was "very
poor."  Plaintiff also contends the ALJ erred in not finding this
impairment was a presumptively disabling "marked" impairment
under social security regulations.  I disagree.

In rejecting this opinion, the ALJ relied on Dr. McDevitt's
testimony that the evaluation was based largely on plaintiff's
self-report, the medical record reflects plaintiff is able to
perform work involving simple, routine, and repetitive tasks,
and such unskilled work would be beneficial to plaintiff.
The ALJ also noted the vocational testing was conducted for the
purpose of determining whether plaintiff could be trained to
perform work at the semi-skilled or skilled level, not unskilled
work.  The ALJ agreed that plaintiff was not able to perform
skilled or semiskilled work.

I have already concluded the ALJ gave clear and convincing reasons for not finding plaintiff entirely credible in describing her functional limitations.  Accordingly, the ALJ had good cause to question the outcome of this evaluation, which was based in large part on plaintiff' self-report.  In any event, the issue is immaterial because the ALJ's finding does not specifically contradict the opinions of Dirske and Beckman that pertain to semi-skilled and skilled work.  On this record, I conclude the ALJ adequately addressed this evidence and gave it the weight to which it was entitled.

**e.**   **Improper Evaluation of the Evidence.**

Plaintiff contends the ALJ improperly evaluated the evidence as to whether (1) plaintiff has a Listed Impairment, or (2) she can perform other work in the national economy.

1.   <u>Listed Impairment</u>.

Plaintiff contends if her testimony, her husband's report as to her daily activity and social functioning limitations, and the vocational evaluation as to her difficulty in maintaining concentration, persistence or pace are credited as true, her impairments would meet the standards for a Listed Impairment under 20 C.F.R. § 404, Apendix 1, Subpart P, §§ 12.02, 12.04, and 12.06, and, therefore, she would be presumptively disabled.

This issue is moot because I have concluded the ALJ did not err in failing to credit that evidence as true.

27 - OPINION AND ORDER

2.    Other Work in the National Economy.

Plaintiff contends the ALJ failed to include in the
hypothetical to the vocational expert a limitation based on
her "periodic episodes of total incapacitation from headaches
and anxiety" that preclude her from performing even simple,
routine, and repetitive tasks on a regular and continuing basis.
Plaintiff argues that if such a limitation had been part of
plaintiff's residual functional capacity assessment and included
in the hypothetical, the vocational expert would have opined that
plaintiff could not perform "other work" in the national economy.

The evidence plaintiff relies on to support this limitation,
however, is once again drawn almost entirely from her testimony,
her statements to her doctors that they relied on in assessing
her limitations, and her husband's evidence.  As set forth above,
the ALJ gave clear and convincing and/or germane reasons for not
crediting that evidence.  Plaintiff, however, also contends
Dr. McDevitt's testimony supports the proposition that plaintiff
cannot perform even unskilled work on a regular and continuing
basis.  I disagree.

Dr. McDevitt pointed out that plaintiff's mood fluctuated.
She performed well at times and poorly at other times.  He was
asked to opine as to plaintiff's ability to work if she had a
GAF score of 50.  He opined that, even with that low score, she
"could function at least at basic competitive activities."

28 - OPINION AND ORDER

He also testified, however, plaintiff's GAF score generally was likely to be in the higher range of 65 or 70, as determined by Dr. Kolilis and Dr. Smurthwaite, respectively, <u>i.e.</u>, some difficulty in social, occupational, or school functioning, "but generally functioning pretty well."

I conclude the ALJ's hypothetical to the vocational expert adequately accounted for plaintiff's workplace limitations.

<u>**CONCLUSION**</u>

For all the reasons set forth above, the Commissioner's final decision denying benefits to plaintiff is **AFFIRMED** and this matter is **DISMISSED** with prejudice.

IT IS SO ORDERED.

DATED this 14 day of July, 2009.


    /s/  Malcolm F. Marsh
MALCOLM F. MARSH
United States District Judge

29 - OPINION AND ORDER

30 - OPINION AND ORDER